IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

───────────────────────────────────

CURTIS GARNER,

                Petitioner,

  v.                                  Civil Action No.
                                       9:01-CV-0501 (LEK/DEP)

JAMES J. WALSH, Superintendent of
Upstate Correctional Facility,

                Respondent.

───────────────────────────────────

APPEARANCES:              OF COUNSEL:

FOR PETITIONER:

CURTIS GARNER, *pro se*
Napanoch, NY

FOR RESPONDENT:

HON. ANDREW M. CUOMO     MICHELLE ELAINE MAEROV, ESQ.
Office of the Attorney General   Ass't Attorney General
State of New York
207 Genesee Street
Utica, NY 13501

DAVID E. PEEBLES
U.S. MAGISTRATE JUDGE

## REPORT AND RECOMMENDATION[1]

Petitioner Curtis Garner, a New York State prison inmate convicted in 1998 of manslaughter in the first degree, based upon the entry of a guilty plea, has commenced this proceeding seeking habeas relief pursuant to 28 U.S.C. § 2254.  In support of that application, Garner challenges both the trial court's acceptance of his plea and the sentence imposed, and additionally asserts that he received ineffective assistance of counsel.

Most, though not all, of the arguments now raised by Garner in support of his petition for habeas relief were previously raised by Garner in the state courts, and rejected.  Having reviewed Garner's petition, which is opposed by the respondent, taking into account the deferential standard owed to the findings of the state courts with respect to these claims, I recommend that the petition be denied.

I.    BACKGROUND

Petitioner's conviction stems from an incident which occurred on February 25, 1998 in an apartment on Stanwix Street in the City of Rome,

---

[1]       Several aspects of this report and recommendation previously were addressed in an order issued by me on January 25, 2005 in conjunction with this action. *See* Dkt. No. 40.  For the sake of completeness, however, I have included in this report several relevant portions of the prior order which bear repeating.

New York.  *See* Transcript of Change of Plea (9/11/98) ("Plea Tr.") at 13-14.  On that date, while Garner and his girlfriend, Sharonica Currie, and others, were presented in the apartment, Akeam Alston, who had previously dated Currie, forcibly kicked in the front door and entered the apartment.  *Id.*  Garner and Alston thereafter became embroiled in an argument concerning Currie and as the two began to fight, Garner "pulled out a gun and aimed for [Altson's] shoulder."  Plea Tr. at 14-15.  Garner fired a shot, resulting in a bullet passing through Alston's arm and lodging in his chest cavity.  Plea Tr. at 15-17.[2]  As Alston ran from the apartment, Garner fired a second, errant shot toward him in the vestibule/hallway of the building.  Plea Tr. at 18-19.  Alston subsequently died of the gunshot wound sustained during his altercation with Garner.  Plea Tr. at 20.

II.   PROCEDURAL HISTORY

   A.   State Court Proceedings

   Garner was indicted on April 7, 1998 by an Oneida County grand jury, and charged with both intentional and depraved indifference murder as a result of the shooting of Alston.  *See* Indictment No. 98-157 (reproduced in Record on Appeal ("Record") at 3).  On September 11,

---

[2]   Garner admitted that he aimed the gun at Alston, and that when he fired the gun he intended to cause Alston serious physical injury.  Plea Tr. at 16.

3

1998, Oneida County Assistant District Attorney Raymond A. Tarkowski, Esq. ("ADA Tarkowski") advised the trial court that following negotiations with his counsel, the prosecution had agreed to allow Garner to plead guilty to one count of first degree manslaughter, in full satisfaction of all charges set forth in the indictment.  Plea Tr. at 2.  During that proceeding, ADA Tarkowski also represented that at sentencing, the prosecution would recommend that Garner be sentenced to a term of twelve and one-half to twenty-five years in prison, but noted that under the terms of the plea proposal, defense counsel would be permitted to argue that Garner should receive a lesser sentence than the term recommended by the prosecution.  *Id.*

Prior to inquiring about the specifics of his proposed plea, the trial court advised Garner that he was required to waive his right to appeal his conviction if he elected to accept the plea proposal offered by ADA Tarkowski.  Plea Tr. at 11.  After Garner responded that he was willing to waive his right to appeal, the trial court proceeded with its plea colloquy.  Plea Tr. at 10-21.  At the conclusion of that proceeding the court accepted Garner's guilty plea, determining that it had been entered "freely, knowingly and voluntarily."  Plea Tr. at 21.

4

On November 19, 1998, Garner appeared before Oneida County Court Judge Michael L. Dwyer for sentencing.  At that time, Garner stated his desire to "take full responsibility for [his] actions."  *See* Transcript of Sentencing (11/19/98) ("Sentencing Tr.") at 38-39.  Judge Dwyer thereafter proceeded to sentence Garner to a term of imprisonment of twelve and one-half to twenty-five years.  Sentencing Tr. at 40-41.

Despite his waiver of that right, Garner appealed his conviction to the New York State Supreme Court, Appellate Division, Fourth Department.  In his appeal, petitioner claimed that 1) his waiver of his right to appeal was not knowingly and intelligently made; and 2) the sentence imposed was unduly severe.  *See* Brief in Support of Appeal ("App. Br.") at 12-19.  A panel of five judges of the the Fourth Department unanimously affirmed Garner's judgment of conviction and sentence in all respects by decision issued on December 30, 1999.  *People v. Garner*, 267 A.D.2d 980, 700 N.Y.S.2d 907 (4th Dep't 1999).  Leave to appeal to the New York State Court of Appeals was subsequently denied on February 22, 2000.  *People v. Garner*, 94 N.Y.2d 903, 707 N.Y.S.2d 387 (2000).

On July 15, 2002, with the assistance of counsel, petitioner filed a

motion to vacate his judgment of conviction pursuant to section 440.10 of

the New York Criminal Procedure Law ("CPL").  In that application,

petitioner alleged that following sentencing, he received statements from

two separate individuals – both of whom had testified against him before

the grand jury – in which they recanted their grand jury testimony.  *See*

Motion to Vacate Judgment of Conviction filed in *People v. Garner*

(7/15/02) (Dkt. No. 17) ("CPL Motion 1") at ¶ 4.  The first statement

provided by Garner in support of his section 440 motion was an affidavit

of his girlfriend, Sharonica Currie.  CPL Motion 1, Ex. A-1 ("Currie

Statement").  In that affidavit, Currie declared that prior to the incident on

February 25, 1998, Alston had threatened to shoot Garner with a

shotgun, and at one time had cut Garner with a razor.  Currie Statement

at 2-3.  Currie stated that on the day Alston was killed, he had kicked in

the door to Garner's apartment and begun beating Currie.  *Id.* at 3.

According to Currie's statement, Garner then fired a shot in the air, and

as Alston "rushe[d] for Garner, the gun [went] off [and Currie] heard a

loud yell."  *Id.*  Currie alleged that she signed the statement provided to

law enforcement agents, in which she claimed that Garner intentionally

shot Alston, because she was "forced[,] threatened and coerced by [the]

6

Oneida County District Attorneys office" into making those false statements. *Id.* at 4. Currie concluded her affidavit by declaring that "all statements, and testimony that [she] made against Curtis Gardner [sic] were false, and made under duress and coercion caused by the District Attorney[']s office, the Rome Police Department and the deceased [*sic*] family." *Id.* at 6.

The second statement submitted in support of petitioner's section 440 motion was signed by Rashita Scott before a notary on September 8, 2001, but did not indicate that the statement was either an affidavit or being made under penalty of perjury.[3] CPL Motion 1 at Exh. A-2 ("Scott Statement"). In that statement, Scott claimed that the Oneida County District Attorney's Office, as well as her own attorney, had pressured her into providing a "false statement" to law enforcement agents regarding Garner's complicity in Alston's death.[4] *Id.* at 1. Specifically, Scott claimed in her statement that the District Attorney's office informed her that if she refused to "go along with the false statements, [Scott] would be

---

[3] The attorney who filed the motion on Garner's behalf declared in his affidavit that Scott was an eyewitness to the incident, and had testified against Garner before the grand jury. CPL Motion at ¶¶ 4, 6. I am unable to verify this fact, however, since no grand jury testimony relating to Garner has been provided to the court.

[4] Respondent did not provide this court with a copy of Scott's statement to the authorities regarding the homicide.

7

sentenced to a 25 to life long jail sentence." *Id.* Scott further indicated in

her statement that she did not "see anything that happened with that

situation on February 25, 1998." *Id.* at 1-2.

On September 9, 2002, Judge Dwyer issued a decision denying

petitioner's section 440 application in all respects. *See People v. Garner*,

No. 98-157 (Oneida Cty. Ct. Sept. 9, 2002) ("September, 2002 Decision")

at 2. After reviewing the statements upon which the motion was based,

Judge Dwyer determined that Garner had not provided any evidence

establishing that his conviction was procured by "duress,

misrepresentation or fraud on the part of the prosecutor." September,

2002 Decision at 2. Judge Dwyer further noted that Garner had failed to

provide evidence demonstrating that his conviction was obtained in

violation of his rights under the United States Constitution. *Id.* Leave to

appeal the denial of petitioner's first section 440 motion to the Fourth

Department was denied by order dated April 4, 2002. *People v. Garner*,

No. 98-157 (4th Dep't Apr. 4, 2003).

On April 26, 2005, proceeding *pro se*, petitioner, at this juncture,

filed a second motion to vacate his judgment of conviction pursuant to

CPL § 440.10. In that application, petitioner reiterated the claims raised

in his first section 440 motion, claiming that after sentencing, he received statements from Sharonica Currie and Rashita Scott which recanted their grand jury testimony against him.  *See* Second Motion to Vacate Judgment of Conviction (4/26/05) (Dkt. No. 42) ("CPL Motion 2") at ¶¶ 30-34.  In his second section 440 application, petitioner also asserted several additional claims, alleging, *inter alia*, (1) his guilty plea was unlawful due to the ineffective assistance of trial counsel; (2) the prosecution withheld exculpatory information in violation of *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194 (1963) and *Giglio v. United States*, 405 U.S. 150, 92 S. Ct. 763 (1972); (3) the grand jury proceedings were defective because the prosecution solicited false testimony from witnesses; and (4) his sentence was illegal and unauthorized.  *See* CPL Motion 2.

On July 1, 2005, Judge Dwyer issued a decision denying petitioner's second section 440 motion in all respects.  *See People v. Garner* , No. 98-157 (Oneida Cty. Ct. July 1, 2005) ("July, 2005 Decision").  Judge Dwyer determined that petitioner's claims regarding the alleged false testimony of Currie and Scott either were previously determined by the court or, alternatively, constituted arguments related to

9

claims on the record which Garner failed to raise on appeal, or which could have been placed on the record for appellate review.  July, 2005 Decision at 2.  Judge Dwyer further determined that petitioner's ineffective assistance claim was meritless, and his waiver of his right to appeal forfeited his right to challenge his sentence as harsh and excessive.  *Id.* at 2-3.  The county court concluded by denying the motion in its entirety based on the lack of any legal grounds to support petitioner's assertions.  *Id.* at 3.  Leave to appeal the denial of petitioner's second section 440 motion to the Fourth Department was denied by order dated November 28, 2006.  *People v. Garner*, No. 98-157 (4th Dep't Nov. 28, 2006).

B.    Proceedings in this Court

Petitioner commenced this proceeding on April 6, 2001 and, at the court's directive, subsequently filed an amended petition on August 7, 2001.  Dkt. Nos. 1, 3, 5.  On November 15, 2001, the Office of the Attorney General for the State of New York, acting on respondent's behalf, filed an answer to Garner's amended petition, accompanied by a legal memorandum as well as some of the relevant records associated with petitioner's prosecution and the state court challenges to his

conviction.  Dkt. Nos. 12, 13.  Petitioner subsequently filed a

memorandum in further support of his amended petition.  Dkt. No. 14.

Petitioner later sought and obtained leave to submit a second

amended petition, which was filed on October 30, 2003.  Dkt. Nos. 30,

32.  In that amended petition, which is now before the court, Garner

argues that (1) he was not aware of the consequences of his plea, due to

the ineffective assistance rendered by his counsel; (2) the trial court was

biased against him; (3) the sentence imposed by the trial court was

based on erroneous facts; (4) his sentence was harsh and excessive; (5)

the statements provided by the recanting witnesses demonstrate that his

conviction was the result of prosecutorial misconduct; and (6) the

prosecution improperly withheld from the defense *Brady*/*Giglio* materials,

in the form of a cooperation agreement into which Scott had entered with

the prosecution.  *See* Second Amended Petition (Dkt. No. 32).  At

respondent's request, the court has considered the answer and

memorandum of law filed in opposition to petitioner's earlier amended

petition as his response to the more recently filed petition.  *See* Dkt. No.

30.

On December 17, 2003, Garner filed a motion seeking permission

to make yet another amendment "to expand his petition by broadening

the scope of information that the witnesses provided in their recantations

including up-dated [sic] cases that would support his petition."  Second

Motion to Amend (Dkt. No. 35) ¶ 10.  In support of that motion to amend,

Garner submitted an incomplete copy of his prior amended petition

together with a memorandum of law.  Given that Garner (1) had not filed

a complete proposed amended petition with his newest motion to amend,

(2) had been afforded ample time and opportunity to submit all of his

arguments and information to the court in prior amended pleadings, and

(3) could have submitted this additional information in his prior motion to

amend his petition but chose not to do so, petitioner's motion to revise his

second amended petition was denied by order of this court dated March

10, 2004.  Dkt. No. 37.

After reviewing Garner's second amended petition, I ordered him to

advise the court whether he wished to (1) withdraw his previously

unexhausted *Brady/Giglio* claim or (2) have his petition stayed so that he

could pursue the unexhausted *Brady/Giglio* claim in the state courts.  Dkt.

No. 40 ("January 25, 2005 Order").  In light of Garner's decision to return

to state court, the federal petition in this matter was stayed.  *See* Dkt. No.

41.

As previously noted, upon his return to the state courts Garner raised not only the unexhausted *Brady/Giglio* claim, but also a host of other claims in his second section 440 motion.  *See* CPL Motion 2 (Dkt. No. 42).  Upon the state court's rejection of that motion on July 1, 2005 and the denial of permission to appeal that ruling, Garner notified the court by letter dated January 4, 2007 that review of his state court motion was complete, and the stay of this proceeding was therefore lifted.  Dkt. No. 53.

On February 12, 2007, Garner filed a third motion to amend his petition in this matter.  Third Motion to Amend (Dkt. No. 55).  Along with the motion, Garner submitted a proposed third amended petition in which he reiterated the claims previously raised, and added five new claims. Dkt. No. 55-2 at 6a.  Respondent opposed the motion, arguing that Garner exceeded the scope of this court's January 25, 2005 Order, which only pertained to the previously-unexhausted *Brady/Giglio* claim, and that Garner "has shown repeated delay, bad faith, and dilatory motive over the nearly six-year course of this litigation."  Dkt. No. 59 at 3.  Garner subsequently submitted a reply to respondent's opposition and in further

13

support of his motion to amend.  Dkt. Nos. 59, 62.  By order dated May 8,

2007, I denied Garner's motion to revise his second amended petition,

finding that he had ample opportunity to submit all of his claims and

noting that the stay had been granted for the sole purpose of allowing him

to exhaust the *Brady/Giglio* claim in state court – a claim that was already

included in his second amended petition.  Dkt. No. 64.

This matter, which is now ripe for determination, has been referred

to me for the issuance of a report and recommendation, pursuant to 28

U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule

72.3(c).  *See also* Fed. R. Civ. P. 72(b).

III.    DISCUSSION

A.    Standard of Review

Enactment of the Antiterrorism and Effective Death Penalty Act of

1996 ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214 (1996), brought

about significant new limitations on the power of a federal court to grant

habeas relief to a state court prisoner under 28 U.S.C. § 2254.  Under the

AEDPA, "a determination of a factual issue made by a State court shall

be presumed to be correct [and t]he applicant shall have the burden of

rebutting the presumption of correctness by clear and convincing

evidence." 28 U.S.C. § 2254(e)(1); *see also Boyette v. Lefevre*, 246 F.3d

76, 88 (2d Cir. 2001) (quoting § 2254(e)(1)) (internal quotes omitted).

Significantly, a federal court may not grant habeas relief to a state

prisoner on a claim

> that was adjudicated on the merits in State court
> proceedings unless the adjudication of the claim –
>
>> 1) resulted in a decision that was
>> contrary to, or involved an
>> unreasonable application of, clearly
>> established Federal law, as
>> determined by the Supreme Court of
>> the United States; or
>>
>> 2) resulted in a decision that was
>> based on an unreasonable
>> determination of the facts in light of the
>> evidence presented in the State court
>> proceeding.

28 U.S.C. § 2254(d); *see also Thibodeau v. Portuondo*, 486 F.3d 61, 65

(2d Cir. 2007); *Noble v. Kelly*, 246 F.3d 93, 98 (2d Cir.), *cert. denied*, 534

U.S. 886, 122 S. Ct. 197 (2001); *Boyette*, 246 F.3d at 88.  When applying

this test, the Second Circuit has noted that

> [u]nder AEDPA, we ask three questions to
> determine whether a federal court may grant
> habeas relief: (1) Was the principle of Supreme
> Court case law relied upon in the habeas petition
> "clearly established" when the state court ruled?
> (2) If so, was the state court's decision "contrary

15

> to" that established Supreme Court precedent?
> (3) If not, did the state court's decision constitute
> an "unreasonable application" of that principle?

*Williams v. Artuz*, 237 F.3d 147, 152 (2d Cir. 2001), *cert. denied* 534 U.S.

924, 122 S. Ct. 279, 151 L.Ed. 205 (2001) (citing *Williams v. Taylor*, 529

U.S. 362, 412-13, 1120 S. Ct. 1495, 1523 (2000) and *Francis S. v.

Stone*, 221 F.3d 100, 108-09 (2d Cir. 2000) (citing *Williams*)).

Because the AEDPA's restriction on federal habeas power was

premised in no small part upon the duty of state courts to uphold the

Constitution and faithfully apply federal laws, the AEDPA's exacting

review standards apply only to federal claims which have been actually

adjudicated on the merits in the state court.  *Washington v. Schriver*, 255

F.3d 45, 52-55 (2d Cir. 2001).  Specifically, as the Second Circuit

explained in *Sellan v. Kuhlman*, "[f]or the purposes of AEDPA deference,

a state court 'adjudicate[s]' a state prisoner's federal claim on the merits

when it (1) disposes of the claim 'on the merits,' and (2) reduces its

disposition to judgment."  261 F.3d 303, 312 (2001); *see Jimenez v.

Walker*, 458 F.3d 130, 140 (2d Cir. 2006) (citing *Sellan*), *cert. denied sub

nom.*, *Jimenez v. Graham*, 127 S. Ct. 976 (2007).  Significantly, the

Second Circuit further held that when a state court adjudicates a claim on

the merits, "a federal habeas court must defer in the manner prescribed by § 28 U.S.C. 2254(d)(1) to the state court's decision on the federal claim – *even if the state court does not explicitly refer to either the federal claim or to relevant federal case law*." *Sellan*, 261 F.3d at 312 (emphasis added).[5,6]

When a state court's decision is found to be decided "on the merits," that decision is "contrary to" established Supreme Court precedent if it applies a rule that contradicts Supreme Court precedent, or decides a case differently than the Supreme Court on a set of materially indistinguishable facts. *Williams*, 529 U.S. at 405-06, 120 S. Ct. at 1519-20. Moreover, a federal court engaged in habeas review

---

[5]    In the past, when wrestling with interpretation and application of the AEDPA's deference standard the Second Circuit had suggested, although leaving open the question, that deference under section 2254(d) is not mandated if a state court decides a case without citing to federal law or otherwise making reference to a federal constitutional claim in a manner adequate to justify deference under the AEDPA, in which case pre-AEDPA standards would apply. *Washington*, 255 F.3d at 52-55; *see also Noble*, 246 F.3d at 98. That court recently clarified in *Sellan*, however, that the question of whether or not a state court makes specific reference to a constitutional principle is not controlling.

[6]    In his opinion in *Sellan*, Chief Judge Walker acknowledged that enlightenment in state court decisions as to the manner of disposition of federal claims presented would greatly enhance a federal court's ability, on petition for habeas review, to apply the AEDPA deference standard. *Sellan*, 261 F.3d at 312. He noted, however, that a state court's failure to provide such useful guidance does not obviate a federal court's duty to make the analysis and pay appropriate deference if the federal claim was adjudicated on the merits, albeit tacitly so. *Id.*

must also determine not whether the state court's determination was merely incorrect or erroneous, but instead whether it was "'objectively unreasonable.'"  *Sellan*, 261 F.3d at 315 (quoting *Williams*, 529 U.S. at 409, 120 S. Ct. at 1521 (O'Connor, J.)).  The Second Circuit has noted that this inquiry admits of "[s]ome increment of incorrectness beyond error", though "the increment need not be great[.]"  *Francis S.*, 221 F.3d at 111.

If a state court does not adjudicate a petitioner's federal claim "on the merits," the federal court must instead apply the pre-AEDPA standard of *de novo* review to the state court's disposition of the federal claim.  *See Cotto v. Herbert*, 331 F.3d 217, 230 (2d Cir. 2003) (citing *Aparicio*, 269 F.3d at 93).

B.    Unlawfully Induced Guilty Plea Based Upon Ineffective
Assistance of Counsel

Central to Garner's assertion that he is entitled to habeas relief is the claim that his guilty plea, although accepted by the trial court, was not knowingly entered.  Petitioner contends that his "conviction was obtained by a plea of guilty, to which was unlawfully induced [sic]" in violation of his constitutional rights.  Second Amended Petition (Dkt. No. 32) ¶ 13, Ground 1.  Garner primarily claims he was persuaded to plead guilty by

his trial counsel, who was ineffective for failing to make Garner "aware of the circumstances of the plea." *Id.* This claim was not presented to the Appellate Division, Fourth Department or to the state court in Garner's first CPL 440.10 motion. Based upon that fact, I initially found that review of this claim was procedurally barred. *See* January 25, 2005 Order at 12-14.

Despite the limited scope of this court's order granting Garner the opportunity to exhaust only his *Brady/Giglio* claim in state court, however, Garner raised a number of additional claims in his second section 440 motion, including a detailed claim that trial counsel was ineffective by advising him to plead guilty. CPL Motion 2. Specifically, petitioner alleged that his counsel had failed to investigate or advise him of the possible defenses of extreme emotional disturbance and justification, improperly advising him that he would not win at trial and therefore should plead guilty to avoid spending his life in prison. CPL Motion 2 at ¶¶ 50-56.

The trial court addressed this claim on the merits, finding that Garner's apparent dissatisfaction with the results of the plea bargain, "which insulated him from a conviction for Murder in the Second Degree,"

19

was "not a basis to establish a lack of meaningful representation."  July,

2005 Decision at 2-3.  Given that the state court has since addressed this

claim on the merits in its decision on petitioner's second section 440

motion, and this claim was already alluded to by Garner in the habeas

petition currently before the court, I find that the state court's findings

represent an adjudication of the claim on the merits and thus are entitled

to AEDPA deference.

> 1.    Clearly Established Supreme Court Precedent

Under the well-established standard governing such claims, in

order to prevail on an ineffective assistance of counsel claim a petitioner

must show both that 1) his or her counsel's performance was deficient, in

that it failed to conform to an objective, reasonableness threshold

minimum level, and 2) that deficiency caused actual prejudice to the

defense, in that the petitioner was effectively deprived of a fair trial, the

results of which were reliable. *Strickland v. Washington,* 466 U.S. 668,

687, 104 S. Ct. 2052, 2064 (1984); *Greiner v. Wells,* 417 F.3d 305, 319

(2d Cir. 2005), *cert. denied,* 126 S. Ct. 1363 (2006). To be

constitutionally deficient, the attorney's conduct must fall "outside the

wide range of professionally competent assistance." *Strickland,* 466 U.S.

at 690, 104 S. Ct. at 2066; *Greiner*, 417 F.3d at 319 (citing *Strickland*). An attorney's performance is judged against this standard in light of the totality of the circumstances and from the perspective of counsel at the time of trial, with every effort being made to "eliminate the distorting effects of hindsight[.]" *Strickland*, 466 U.S. at 689, 104 S. Ct. at 2065; *Greiner,* 417 F.3d at 619 (citing Strickland).

When reviewing an attorney's performance against this backdrop, a court will generally indulge in a presumption that constitutionally adequate assistance has been rendered, and significant decisions have been made through the exercise of sound professional judgment to which "a heavy measure of deference" is afforded. *Strickland,* 466 U.S. at 691, 104 S. Ct. at 2066; *Greiner,* 417 F.3d at 319 (citing *Strickland).* In a case such as this, a petitioner must establish that his or her attorney omitted significant and obvious issues while pursuing issues that were clearly and significantly weaker; it is not enough to show only that counsel omitted a nonfrivolous argument, as an attorney has no duty to advance every such argument. *Jones v. Barnes,* 463 U.S. 745, 754, 103 S. Ct. 3308, 3314 *(1983); Mayo v. Henderson,* 13 F.3d 528, 533 (2d Cir.) (citing *Jones*), *cert. denied,* 513 U.S. 820, 115 S. Ct. 81 (1994).

Addressing the second prong of the *Strickland* test, courts have generally held that prejudice is established by showing that there is a "reasonable probability" that but for the deficiency "the result of the proceeding would have been different." *Strickland,* 466 U.S. at 694, 104 S. Ct. at 2068; *Henry v. Poole,* 409 F.3d 48, 63-64 (2d Cir. 2005); *Reed v. Smith,* No. 05-CV-3969, 2006 WL 929376, at *6 (E.D.N.Y. Apr. 11, 2006).

In the context of a guilty plea, a petitioner must show that there is a reasonable probability that, but for counsel's deficient performance, the petitioner would not have pleaded guilty and instead would have exercised his or her right to a trial.  *Hill v. Lockhart*, 474 U.S. 52, 59, 106 S. Ct. 366, 370-71 (1985); *United States v. Coffin*, 76 F.3d 494, 498 (2d Cir.), *cert. denied*, 517 U.S. 1147, 116 S. Ct. 1445 (1996); *Baker v. Murray*, 460 F. Supp. 2d 425, 434 (W.D.N.Y. 2006); *Padilla v. Keane*, 331 F. Supp. 2d 209, 215 (S.D.N.Y. 2004).

To gauge whether a petitioner would have opted to go to a trial had his or her counsel provided more precise or extensive information, courts consider several factors.  *See Padilla*, 331 F. Supp. 2d at 216.  First, the question of whether the record supports the finding that the plea was

22

knowing, voluntary and intelligent must be examined.  *Id.*  If the record

supports such a finding, a guilty plea is not invalidated simply because

the petitioner confronted the choice of pleading guilty or facing trial on

more serious charges.  *Id.*  Indeed, "[w]here a defendant . . . has

explicitly stated in his [or her] allocution that he [or she] fully understands

the consequences of his [or her] plea and that he [or she] has chosen to

plead guilty after a thorough consultation with his [or her] attorney, a

district court on habeas review may rely on the defendant's sworn

statements and hold him [or her] to them."  *Id.* at 217 (citations omitted).

Another relevant factor to be considered when weighing a

*Strickland* claim in the context of a guilty plea involves the specific

circumstances applicable to the defendant's decision.  *Id.*  Where the

evidence of a defendant's guilt is overwhelming, as in Garner's case, "the

burden of demonstrating prejudice to satisfy the second *Strickland* prong

is virtually insurmountable."  *Id.* (citing *Strouse v. Leonardo*, 928 F.2d

548, 556 (2d Cir. 1991)).  Additionally, where a defendant obtains a

meaningful strategic benefit by pleading guilty, most courts consider it

unlikely that an involuntary or ill-advised plea ensued.  *Id.* (citing, *inter*

*alia*, *Feliz v. United States*, No. 01 Civ. 5544, No. 00 Cr. 53, 2002 WL

1964347, at *7 (S.D.N.Y.  Aug. 22, 2002) ("[N]o prejudice exists when a plea agreement lessens the severity of the sentence defendant would face if convicted at trial.").

Lastly, when assessing the voluntariness of a guilty plea in a setting such as that presented, habeas courts look to whether a defendant has submitted any new evidence to suggest he or she in fact would have made a different decision but for his attorney's allegedly improper advice.  *Id.* at 217-18.  Unsupported and conclusory allegations that the defendant would have acted differently, however, are inadequate to establish prejudice under *Strickland*.  *Id.* at 218.

As the Supreme Court noted,

[a] guilty plea, voluntarily and intelligently entered, may not be vacated because the defendant was not advised of every conceivable constitutional plea in abatement he might have to the charge, no matter how peripheral such a plea might be to the normal focus of counsel's inquiry.  And just as it is not sufficient for the criminal defendant seeking to set aside such a plea to show that his counsel in retrospect may not have correctly appraised the constitutional significance of certain historical facts, it is likewise not sufficient that he show that if counsel had pursued a certain factual inquiry such a pursuit would have uncovered a possible constitutional infirmity in the proceedings.

*Tollett v. Henderson*, 411 U.S. 258, 267, 93 S. Ct. 1602, 1608 (1973) (citations omitted).  To be successful in his quest for habeas relief,

24

Garner must show not only that there was an actual constitutional error, but that counsel's advice to plead guilty without having uncovered those errors fell outside the range of professionally competent assistance. *Tollett*, 411 U.S. at 267, 93 S. Ct. at 1608; *Strickland*, 466 U.S. at 690, 104 S. Ct. at 2052.

    2.   Contrary to, or Unreasonable Application of, Clearly
        Established Supreme Court Precedent

Analyzed under these standards, the record fully supports the trial court's finding that Garner has not established a lack of effective representation.

First, despite petitioner's protestations to the contrary, the record firmly discloses that his counsel's performance was clearly reasonable. Although Garner asserts that his attorney did not investigate possible defenses, the record refutes that claim. From as early as the pre-trial motion stage of the case, counsel investigated possible defenses, recognized and advanced the theory that Garner acted under extreme emotional disturbance, and argued that the preliminary hearing testimony established only that Garner was guilty of first degree manslaughter. CPL Motion 2, Exh. A at 6. Between the plea and sentencing, counsel prepared an extensive pre-sentence memorandum, eliciting and

compiling several letters written by petitioner's friends and family members.  Record at 27-135.  In his pre-sentence memorandum, Garner's counsel boasted about petitioner's good character, asserting that in his community, Garner was considered to be a "decent, well-mannered and respectful young man."  *Id.* at 33.  When passing sentence, counsel urged the court to consider that Garner was simply protecting himself and Currie.  *Id*.  At sentencing, counsel again advanced these arguments, urging the court to impose the minimum sentence.  Sentencing Tr. at 17-38.

Even assuming, *arguendo*, that counsel's conduct was in fact deficient, falling below the *Strickland* threshold minimum level of competence, the record discloses no actual prejudice suffered by Garner. In this regard, it is evident that Garner's plea was knowing, voluntary and intelligent.  A review of the plea allocution in this matter reflects that the trial court made a thorough inquiry to determine whether petitioner's plea of guilty was voluntary and intelligent.  The court explained the proposed plea agreement in detail to Garner, and clarified that at the time of sentencing, the prosecutor would ask the court to impose a sentence of twelve and one-half to twenty-five years in prison, as in fact occurred, but

that Garner's attorney would likely argue for less time, and the court would consider the arguments and decide what sentence would be appropriate.  Plea Tr. at 4-5.   Both defendant and his counsel indicated they had discussed the terms of the proposed plea agreement.  Plea Tr. at 6-9, 21.  During the plea colloquy, the court established that no threats or promises had been made to induce Garner's plea, including that no one promised him he would receive less than twelve and one half to twenty-five years.  Plea Tr. at 5-6.  The court's questions, and Garner's answers to them, established that Garner had no difficulty understanding the proceedings.  Plea Tr. at 5-7.  The court ensured that Garner was apprised of and understood the rights he was relinquishing by pleading guilty.  Plea Tr. at 8-13.  Lastly, the trial court ascertained that Garner understood the nature of the charge to which he was pleading guilty, and through Garner's extensive allocution, ascertained that he did in fact commit that crime.  Plea Tr. at 13-21.  In light of the record, Garner's bare assertion that he would not have pleaded guilty had counsel informed him more fully of possible defenses rings insincere.  Given the overwhelming evidence against him, it is unlikely Garner would have been outright acquitted of all charges; as such, the plea worked to his

27

advantage.

As the state court noted, moreover, Garner's counsel negotiated a plea agreement that insulated his client from possible conviction on two counts of second degree murder, resulting in a significant strategic benefit to the petitioner.  I note that Garner's exposure, had he been convicted after trial, was a maximum time of incarceration of between twenty-five years and life in prison.  N.Y. Penal Law §70.00(2)(a), 3(a)(i). Under the terms of the plea agreement, by contrast, Garner was permitted to plead guilty to first degree manslaughter with the hope of a sentence less than the maximum permitted under the statute.  Plea Tr. at 2-5; Sentencing Tr. at 17-38.

In sum, based upon my review of the state court record, including transcripts of Garner's plea and sentencing and counsel's pre-sentence memorandum, I conclude that Garner has failed to establish that the state court's denial of his ineffectiveness claim is either contrary to or an unreasonable application of established Supreme Court precedent.  I therefore recommend that this ground of Garner's petition be denied.

C.    Trial Judge's Bias When Imposing Sentence

In his petition, Garner also claims that his guilty plea should be

28

vacated because the trial judge was biased and made "prejudicial remarks toward the Petitioner" during sentencing.  Second Amended Petition (Dkt. No. 32) ¶ 13, Ground 1.  In support of this contention, petitioner cites to the following comments made by Judge Dwyer during sentencing, construed by him as prejudicial, and maintains that as a result, his plea and sentence did not coincide with the facts of his case:

> Despite what you say and despite what your attorney says, I, for one minute, don't believe that you were up here to go to college.  You had ample time to enroll in any school.  You weren't up here to go to school.  You came up with a gun, and you came up with someone that brought up drugs to this area.  And quite frankly, the people of this community are sick and tired of people coming up here from New York City with their guns and with their drugs.  Week in and week out I'm sentencing people from New York City for drug possession, drug sales, weapons possession and weapons sales and assaults and murders.  We are fed up with it.  You weren't up here to go to school.  You were involved in the same type of thing.  You came up here with someone that had a boat load of drugs on them, and you brought a gun.  To that means, you thought about that you were going to do.

Sentencing Tr. at 39-40.

In the direct appeal of his conviction taken by the petitioner, relying on the same sentencing colloquy as alleged herein and cited above, Garner argued that the trial judge predicated his sentence upon improper considerations, citing as an example the sentencing judge's statements

regarding drug dealing.  Appellant's Br. at 12-14; *see also infra* at Part

III.D.  Petitioner, however, never specifically argued in the state courts

that the acceptance of his guilty plea was itself infected by the bias

allegedly demonstrated against him by the court's statements during

sentencing.  *Id.*  As a threshold matter, I must therefore determine the

legal consequences, if any, associated with this failure to present the

argument now being made to the state courts.

    1.    <u>Exhaustion</u>

Prior to seeking federal habeas relief, a petitioner must exhaust

available state remedies, or establish either an absence of available

state remedies or that such remedies cannot adequately protect his or

her rights.  *Aparicio*, 269 F.3d at 89 (quoting 28 U.S.C. § 2254(b)(1));

*Ellman v. Davis*, 42 F.3d 144, 147 (2d Cir. 1994), *cert. denied*, 515 U.S.

1118, 115 S. Ct. 2269 (1985).  The exhaustion doctrine recognizes

"respect for our dual judicial system and concern for harmonious

relations between the two adjudicatory institutions."  *Daye v. Attorney*

*Gen. of New York*, 696 F.2d 186, 191 (2d Cir. 1982).  "Comity concerns

lie at the core of the exhaustion requirement."  *Galdamez v. Keane*, 394

F.3d 68, 72 (2d Cir. 2005).  Though both federal and state courts are

30

charged with securing a state criminal defendant's federal rights, the state courts must initially be given the opportunity to consider and correct any violations of federal law. *Id.* "The chief purposes of the exhaustion doctrine would be frustrated if the federal habeas court were to rule on a claim whose fundamental legal basis was substantially different from that asserted in state court." *Daye*, 696 F.2d at 192 (footnote omitted).

This exhaustion requirement is satisfied if the federal claim has been "fairly presented" to the state courts. *See Dorsey v. Kelly*, 112 F.3d 50, 52 (2d Cir. 1997) (quoting *Picard v. Connor*, 404 U.S. 270, 275, 92 S.Ct. 509, 512 (1971)). A claim has been "fairly presented" if the state courts are apprised of "both the factual and the legal premises of the claim [the petitioner] asserts in federal court." *Daye*, 696 F.2d at 191. Thus, "the nature or presentation of the claim must have been likely to alert the court to the claim's federal nature." *Id.* at 192.

When a claim has never been presented to a state court, a federal court may find that there is an absence of available state corrective process under § 2254(b) "if it is clear that the unexhausted claim is procedurally barred by state law and, as such, its presentation in the state forum would be futile." *Aparicio*, 269 F.3d at 90 (*citing Reyes v.*

31

*Keane*, 118 F.3d 136, 139 (2d Cir. 1997)); *Lurie v. Wittner*, 228 F.3d 113, 124 (2d Cir. 2000) (federal court may address merits of a habeas petition containing unexhausted claims where there is no further state proceeding for petitioner to pursue or where further pursuit would be futile), *cert. denied* 532 U.S. 943, 121 S. Ct. 1404 (2001).  As such, I must determine whether it would be futile for petitioner to present the newly-asserted theory regarding trial court bias to the state courts.

Petitioner cannot now file a direct appeal with the Fourth Department in order to advance this claim, since in New York a defendant is "entitled to one (and only one) appeal to the Appellate Division." *See Aparicio*, 269 F.3d at 91.  Moreover, since "New York does not otherwise permit collateral attacks on a conviction when the defendant unjustifiably failed to raise the issue on direct appeal," *id.* (citing CPL § 440.10(2)(c)), petitioner cannot now properly raise this claim, which is based upon the record, in a third section 440 motion. *Aparicio*, 269 F.3d at 91; *Bossett v. Walker,* 41 F.3d 825, 829 (2d Cir. 1994), *cert. denied*, 514 U.S. 1054, 115 S. Ct. 1436 (1995).  This claim is therefore "deemed exhausted" for purposes of petitioner's habeas petition.  *Spence v. Superintendent, Great Meadow Corr. Fac.*, 219 F.3d

32

162, 170 (2d Cir. 2000); *Senor v. Greiner*, No. 00-CV-5673, 2002 WL

31102612, at *10 (E.D.N.Y. Sept. 18, 2002).

>   2.    Procedural Default

Although Garner's claim that the trial court was biased against him

is "deemed exhausted," it is also procedurally defaulted.  *See Aparicio*,

269 F.3d at 90.   Accordingly, a federal court may not engage in habeas

review of the claim unless the petitioner demonstrates either 1) both

good cause for and actual prejudice resulting from his procedural default,

or (2) that the denial of habeas relief would leave unremedied a

fundamental miscarriage of justice.  *Fama v. Comm'r of Corr. Servs.*, 235

F.3d 804, 809 (2d Cir. 2000); *Garcia v. Lewis*, 188 F.3d 71, 76-77 (2d

Cir. 1999); *Levine v. Comm'r of Corr. Servs.*, 44 F.3d 121, 126 (2d Cir.

1995).  Under this second exception, which is both exacting and intended

for the "extraordinary case, where a constitutional violation has probably

resulted in the conviction of one who is actually innocent[,]" *Murray v.

Carrier*, 477 U.S. 478, 496, 106 S. Ct. 2639, 2649 (1986); *see also

House v. Bell*, 126 S. Ct. 2064, 2076 (2006); *Lebron v. Mann*, 40 F.3d

561, 564 (2d Cir. 1994), "the principles of comity and finality that inform

the concepts of cause and prejudice 'must yield to the imperative of

correcting a fundamentally unjust incarceration.'"  *Murray*, 477 U.S. at 495, 106 S. Ct. at 2649 (quoting *Engle v. Isaac*, 456 U.S. 107, 135, 102 S. Ct. 1558, 1576 (1982)).

To establish "cause" sufficient to excuse a procedural default, a petitioner must show that some objective external factor impeded his or her ability to comply with the relevant procedural rule.  *Coleman v. Thompson*, 501 U.S. 722, 753, 111 S. Ct. 2546, 2566-67 (citing *Murray*, 477 U.S. at 488, 106 S. Ct. at 2645); *Restrepo v. Kelly*, 178 F.3d 634, 639 (2d Cir. 1999) (citing, *inter alia*, *Coleman*).  Examples of such external mitigating circumstances can include "interference by officials," ineffective assistance of counsel, or that "the factual or legal basis for a claim was not reasonably available" at trial or on direct appeal.[7]  *Murray*, 477 U.S. at 488, 106 S.Ct. at 2645.  When a petitioner has failed to establish adequate cause for his or her procedural default, the court need not go on to also examine the issue of prejudice, since federal habeas relief is generally unavailable as to procedurally defaulted claims

---

[7]     It should be noted, however, that "[a]ttorney ignorance or inadvertence is not 'cause' because the attorney is the petitioner's agent when acting, or failing to act, in furtherance of the litigation, and the petitioner must 'bear the risk of attorney error.'" *Coleman*, 501 U.S. at 753, 111 S.Ct. at 2566-67 (quoting *Murray,* 477 U.S. at 488, 106 S.Ct. at 2645).

unless both cause and prejudice are demonstrated.  *Stepney v. Lopes*, 760 F.2d 40, 45 (2d Cir. 1985); *Long v. Lord*, No. 03-CV-0461, 2006 WL 1977435, at *6 (N.D.N.Y. March 21, 2006) (McCurn, S.J.) (citing *Stepney*); *Staley v. Greiner*, No. 01 Civ 6165, 2003 WL 470568, at *7 (S.D.N.Y. Feb. 6, 2003) (citing *Stepney*).  In such a case, absent evidence to show the petitioner's innocence of the crime of conviction, no basis is presented to conclude that the failure to consider the merits of the federal claim would result in a fundamental miscarriage of justice, which has been interpreted as amounting to "an unjust incarceration." *Spence*, 219 F.3d at 170.

Garner has failed to establish cause for his failure to exhaust this claim, and has never argued, in either the state courts or this proceeding, that his appellate counsel rendered ineffective assistance by failing to argue in the state courts that the trial judge was biased against him. Since Garner has not established cause for his procedural default, I need not decide whether he suffered actual prejudice, inasmuch as federal habeas relief is generally unavailable as to procedurally defaulted claims unless *both* cause and prejudice are demonstrated.  *See Stepney*, 760 F.2d at 45; *Staley*, 2003 WL 470568, at *7; *Pou* , 977 F. Supp. at 581.

Additionally, particularly in view of Garner's failure to offer any evidence to show his actual innocence of the crime for which he was convicted, I find no basis to conclude that this court's failure to consider the merits of this claim would result in a fundamental miscarriage of justice, which has been interpreted as amounting to "an unjust incarceration."  *Spence*, 219 F.3d at 170.   I therefore recommend that this aspect of Garner's petition be denied on this procedural basis.[8]

D.   Propriety of Sentence and Abuse of Discretion

In tandem with his allegations of trial court bias, Garner also claims that his sentence was the product of the trial court's reliance upon misinformation and erroneous conclusions about him, thereby violating his due process rights.  Specifically, Garner alleges the sentencing court improperly concluded that he did not travel to Oneida County from New York City for the purpose of enrolling in school, as he asserted; that he

---

[8]      I note that respondent does not argue that this claim is procedurally barred. *See* Respondent's Memorandum (Dkt. No. 13) at 6, 8-9.  Although a district court can raise a petitioner's failure to exhaust and a procedural default as a basis for the denial of federal habeas relief *sua sponte*, *see, e.g.*, *Acosta v. Artuz*, 221 F.3d 117, 121 (2d Cir. 2000) (*citing, inter alia*, *United States v. Vincent*, 507 F.2d 1309, 1312 (2d Cir. 1974)), the Second Circuit has held that before dismissing a habeas claim on procedural grounds on its own initiative, a district court must afford the petitioner notice of its intention to dismiss the claim on a procedural basis and an opportunity to be heard.  *Acosta*, 221 F.3d at 124-26.  Accordingly, if petitioner believes that his claim relating to the trial court's alleged bias against him has not been procedurally forfeited, he should raise this contention in timely-filed objections to this report and recommendation.

36

brought a gun with him and traveled with someone who brought drugs to the area; and that Garner was involved in the "same type of thing" – that is, drug dealing.  Second Amended Petition (Dkt. No. 32), Grounds 1-2. Garner also claims that this conviction was his first, eliminating any basis for the court to conclude he was involved in anything illegal.  *Id.*  Finally, Garner contends that the sentencing court failed take into account the circumstances surrounding the crime for which he was convicted, including his contention that when shooting the victim, he was simply protecting his pregnant girlfriend and their unborn child.  *Id.*

The claims now being raised in connection with his sentencing were raised by Garner in his direct appeal.  In its decision, the Appellate Division noted that the record did not support Garner's claim that "he was sentenced on the basis of materially untrue assumptions or misinformation."  *Garner*, 267 A.D.2d at 980-81, 700 N.Y.S.2d at 907. The court also found that Garner was "properly punished for a crime that he committed, not for crimes committed by others."  *Id*. at 981, 700 N.Y.S.2d at 907.

It is well-settled that judges retain the inherent authority to exercise broad discretion when imposing sentences within a statutorily prescribed

37

range.  *See United States v. Booker*, 543 U.S. 220, 233, 125 S. Ct. 738, 743-44 (2005).  As such, a petitioner's assertion that a judge abused his discretion when imposing a sentence is generally not a federal claim which is subject to review by a habeas court.  *See Fielding v. LeFevre*, 548 F.2d 1102, 1109 (2d Cir.1977).  This is so even in circumstances where a defendant is young, where there are positive factors in the pre-sentencing memorandum and where a defendant has few, if any, prior convictions.  *Fielding*, 548 F.2d at 1109 (petitioner raised no cognizable federal claim by seeking to prove that state judge abused his sentencing discretion by disregarding psychiatric reports); *see also Valentine v. Lord*, No. 03 Civ. 4834, 2006 WL 1997708, at *4 (S.D.N.Y. July 18, 2006) (argument that sentence harsh and excessive due to petitioner's youth when she committed the crime and her lack of prior criminal record is not a constitutional basis for overturning a sentence when it otherwise lies within the prescribed statutory range); *Steele v. Filion*, 377 F. Supp. 2d 332, 337 (W.D.N.Y. 2005) (no abuse of discretion in imposing consecutive sentences where sentence within the applicable statutory range, even though petitioner had one prior misdemeanor conviction and positive factors in the pre-sentencing profile); *Davis v. Senkowski*, No.

97-CV-2328, 1998 WL 812653, at *8 (E.D.N.Y. Aug. 6, 1998) (rejecting argument that sentence was excessive in light of petitioner's youth and prior criminal record).

Even if this court were empowered, on habeas review, to examine the rationale for the sentence imposed upon Garner, I would find that the record in this case is fully supportive of the Appellate Division's finding that Garner was not sentenced on the basis of materially untrue assumptions or misinformation, or that he was punished for any crime but the one he committed.  It should be noted that "at sentencing, 'the judge may consider hearsay, evidence of uncharged crimes, dropped counts of an indictment, and crimes charged that resulted in acquittal.'"  *Jones v. Donnelly*, 487 F. Supp. 2d 403, 416 (S.D.N.Y. 2007) (quoting *Arocho v. Walker*, No. 01-CV-1367, 2001 WL 856608, at *4 (S.D.N.Y. July 27, 2001)).  A sentencing court may not, however, rely upon information that is "clearly unreliable or inaccurate."  *Jones*, 487 F. Supp. 2d at 416-17.

When Garner pleaded guilty, he allocuted and described the circumstances surrounding the death of the victim.  Plea Tr. at 16-22.  At the time his plea was entered, Garner explained that he and the victim had engaged in a physical altercation over a shared girlfriend, Sharonica

Currie, and admitted he shot the victim with the intent to cause serious physical injury, further acknowledging that he used a 9 millimeter handgun which he brought from New York City to shoot the victim.  Plea Tr. at 15-16.  Garner further admitted that he was adjudicated a youthful offender in 1995 for criminal possession of a controlled substance in the third degree.  *Id.* at 7.

Prior to sentencing, Garner's counsel prepared and submitted a pre-sentence memorandum, *see* Record at 27-135, which was discussed at sentencing and considered by the court.  Sentencing Tr. at 16-17, 40. The prosecutor asked the judge to further consider the prior youthful offender adjudication and a portion of the grand jury minutes which revealed that Garner and his cousin brought cocaine from New York City the day before the victim was killed, and that another person was arrested for possession of that cocaine.  *Id.* at 16-17.  Defense counsel then spoke on Garner's behalf, including setting forth Garner's version of events that included the theory that he was trying to protect Currie from the victim.  *Id.* at 17-38.  During his sentencing, Garner apologized and took "full responsibility" for his actions.  *Id.* at 38-39.

The sentencing court considered these arguments and the

40

documents submitted when imposing sentence.  Judge Dwyer noted that Garner brought a gun from New York City and traveled with a person who brought a "boat load" of drugs along with them.  Sentencing Tr. at 40.  The court, after stating that it read through "every single letter" from Garner's family members and teachers, concluded that Garner was "not the same person described in the pre-sentence memorandum.  You are not.  You've taken a life, and you need to be punished for it."  *Id.*  The court then imposed the maximum allowable sentence.  *Id.* at 40-41.

As there is no evidence that the sentencing court relied upon misinformation, the court did not exceed its discretion when it considered Garner's transportation of a gun, his association with a drug courier, and his prior youthful offender adjudication when it imposed the maximum sentence.  *See Jones*, 487 F. Supp. 2d at 417.  Accordingly, I recommend that Garner's petition on this ground be denied.

E.    Harsh and Excessive Sentence

Garner claims that the sentence imposed was harsh and excessive in light of his background as well as the facts and circumstances surrounding the incident that resulted in his conviction.  Second Amended Petition (Dkt. No. 32) ¶ 13, Ground 2.  At the time of the plea,

41

Garner waived his right to appeal on the condition that he would be sentenced to no more than twelve and one-half to twenty-five years in prison.  Plea. Tr. at 12.  Garner does not now challenge the validity of the waiver of appeal in his habeas petition.  *See* Second Amended Petition (Dkt. No. 32).

Despite his legally effective waiver of appeal, Garner appealed his conviction, challenging both the length and propriety of the sentence imposed.  In its decision, the Appellate Division concluded that under New York state law, Garner's knowing and intelligent waiver of appeal "encompassed the right to challenge the sentence as harsh and excessive."  *Garner*, 267 A.D.2d at 980, 700 N.Y.S.2d at 907 (citing *People v. Hidalgo*, 91 N.Y.2d 733, 737, 675 N.Y.S.2d 327, 329 (1998)).

Garner again challenged his sentence in his second section 440 motion.  Like the Appellate Division, the county court found that the sentence claim was forfeited by virtue of Garner's valid waiver of appeal. July, 2005 Decision at 3.

1.  <u>Garner's Claim Is Procedurally Barred by Virtue of His Waiver of the Right to Appeal</u>

As a matter both of comity, and in keeping with the principles of federalism, a federal court ordinarily will not review a federal claim

presented in a habeas petition if it has been rejected by the state courts

on a ground which is both "independent and adequate," unless a

petitioner can show both cause and prejudice or a fundamental

miscarriage of justice.  *Coleman*, 501 U.S. at 736, 111 S. Ct. at 2558;

*Harris v. Reed*, 489 U.S. 255, 261, 109 S. Ct. 1038, 1042 (1989); *Murden

v. Artuz*, __ F.3d __, 2007 WL 2282658, at *8 (2d Cir. Aug. 10, 2007);

*Monroe v. Kuhlman*, 433 F.3d 236, 240-41 (2d Cir. 2006); *Brown v.

Greiner*, 409 F.3d 523, 532 (2d Cir. 2005).  While a procedural forfeiture

is typically the product of a failure to comply with a state's requirements

regarding timely presentment of issues to the court, the question of

whether a default discerned by a state court is sufficiently adequate and

independent to preclude federal habeas review is governed by federal

law.  *Monroe*, 433 F.3d at 241.

    Addressing the issue of adequacy, the Second Circuit has

observed that

> a procedural bar will be deemed adequate only if
> it is based on a rule that is firmly established and
> regularly followed by the state in question.  When
> a federal court finds that the rule is inadequate
> under this test the rule should not operate to bar
> federal review.  Nonetheless, the principles of
> comity that drive the doctrine counsel that a
> federal court that deems a state procedural rule

> inadequate should not reach that conclusion
> lightly or without clear support in state law.

cause for this procedural default; namely, although Garner challenged

the *Garcia v. Lewis*, 188 F.3d 71, 77 (2d Cir. 1999) (internal citations and

quotation marks omitted).  As may be self-evident, a state court

determination is sufficiently independent, for purposes of this rule, if it is

divorced from and bears no relation to the merits of the federal law claim

presented.  *See Brown*, 409 F.3d at 532.  When addressing the question

of procedural forfeiture, a court should presume that there is no

independent and adequate state ground for a state court decision when

the decision "fairly appears to rest primarily on federal law, or to be

interwoven with the federal law, and when the adequacy and

independence of any possible state law ground is not clear from the face

of the opinion[.]'" *Coleman*, 501 U.S. at 733, 111 S. Ct. at 2556 (quoting

*Michigan v. Long*, 463 U.S. 1032, 1040-41, 101 S. Ct. 3469, 3476

(1983)).

For a federal court to deny habeas review based on the

independent and adequate state ground doctrine, it must be clear that

the state court actually relied upon the procedural bar as an independent

basis for its disposition of the claim.  *Fama*, 235 F.3d at 809.  In a case

where both procedural and substantive arguments have been advanced by the parties but no opinion is issued by the state court explaining its rejection of a claim, a federal court may properly assume that the state court based its decision on state procedural grounds absent "good reason" to believe the state courts' silence represents a decision to deny the claim on its merits. *Quirama v. Michele*, 983 F.2d 12, 14 (2d Cir. 1993). In instances where a state court has expressly found both a failure to preserve the argument for appellate review and alternatively or "in any event" that the argument lacks merit, the procedural bar applies. *Fama*, 235 F.3d at 810 n.4 (citing *Glenn v. Bartlett*, 98 F.3d 721, 724-25 (2d Cir. 1996), *cert. denied* 520 U.S. 1108, 117 S. Ct. 1116 (1997) and *Velasquez v. Leonardo*, 898 F.2d 7, 9 (2d Cir. 1990)). If there is ambiguity, however, as in "when a state court uses language such as '[t]he defendant's remaining contentions are either unpreserved for appellate review or without merit,' the validity of the claim is preserved and is subject to federal review." *Fama*, 235 F.3d at 810; *see also Coleman*, 508 U.S. at 735, 111 S. Ct. at 2557.

In the present case, the state courts predicated dismissal of

petitioner's harsh and excessive sentence claim on his waiver of his right to appeal.  Under New York law, a knowing and voluntary waiver of the right to appeal precludes appellate review of whether a sentence was harsh and excessive.  *See* N.Y. Crim. Proc. Law § 450.10(1)(a) (stating that defendant may appeal "[a] judgment other than one including a sentence of death, unless the appeal is based solely upon the ground that a sentence was harsh or excessive when such sentence was predicated upon entry of a plea of guilty and the sentence imposed did not exceed that which was agreed to by the defendant as a condition of the plea and set forth on the record"); *People v. Hidalgo*, 91 N.Y.2d 733, 737, 675 N.Y.S.2d 327, 329 (1998) (asserting that waiver of right to appeal encompassed sentencing claim where defendant pleaded guilty without an agreed-upon sentence, was informed of the maximum time she faced, and indicated that she understood the terms of the plea and the waiver).  A state procedural bar is considered "adequate" if it "'is firmly established and regularly followed by the state in question'", *Murden*, 2007 WL 2007 WL 2282658, at *8 (quoting *Monroe*, 433 F.3d at 241), and courts within this circuit have held that the affirmative waiver of

46

a petitioner's right to appeal indeed provides an adequate and
independent state ground to deny habeas relief.  *See McClane v.
Superintendent*, No. 05 CV 5833, 2007 WL 295599, at *3 (E.D.N.Y. Jan.
24, 2007) (noting that petitioner's claims were procedurally barred based
upon independent and adequate state law grounds given that
defendant's waiver of his right to appeal foreclosed appellate review of
his sentence as harsh and excessive); *Acosta v. Giambruno*, 326 F.
Supp. 2d 513, 522 (S.D.N.Y. 2004) (indicating that petitioner's valid
waiver of his right to appeal as a condition to his plea agreement was an
independent and adequate state law ground on which to deny habeas
relief for his claims of harsh and excessive sentence); *Singh v.
Kuhlmann*, No. 94 CIV. 2213, 1996 WL 337283, at *4 (S.D.N.Y. June 19,
1996) (same); *but see Nicholas v. Smith*, No. 02-CV-6411, 2007 WL
1213417, at *17 (E.D.N.Y. Apr. 24, 2007) (noting that under the
circumstances of this case, where petitioner raised questions concerning
whether he had validly waived his appellate rights under state law, it was
possible that the procedural bar as to his harsh and excessive sentence
claim was not an adequate state law ground).

47

The state courts rejected Garner's claim that the waiver of the right to appeal was not knowing and intelligent, and found that the waiver encompassed the claim that the sentence imposed was harsh and excessive.  *See Garner*, 267 A.D.2d at 980, 700 N.Y.S.2d at 907; *see also* July, 2005 Decision.  In so doing the courts relied upon, and cited to, state law.  *See Garner*, 267 A.D.2d at 980, 700 N.Y.S.2d at 907 (citing *Hidalgo*, 91 N.Y.2d at 737, 675 N.Y.S.2d at 329); *see also* July, 2005 Decision at 3 (citing *Hidalgo*).  Since the state courts specifically predicated the dismissal of Garner's excessive sentence claim on his waiver of the right to appeal, the decision rests upon an independent and adequate state ground, and federal review accordingly is barred. *Coleman*, 501 U.S. at 731, 111 S. Ct. at 2554-55; *Engle*, 456 U.S. at 128-129, 102 S. Ct. at 1572; *Acosta*, 326 F. Supp. 2d at 522-523.  Such a determination by a state court constitutes a finding of procedural default, and my review of this ground is therefore conditioned upon identifying a proper basis, if any, for excusing or overlooking petitioner's default, specifically a finding of cause and prejudice or a fundamental miscarriage of justice.  *See Fama*, 235 F.3d at 809; *Garcia*, 188 F.3d at

76-77.

Garner has not offered any basis to cast doubt on the validity of his waiver of appeal.  In the course of his direct appeal to the Appellate Division, Garner failed to contend in his habeas application that the waiver was invalid because, for example, his trial counsel was ineffective. Since petitioner has not demonstrated cause for his procedural default, I need not decide whether he suffered actual prejudice because federal habeas relief is generally unavailable as to procedurally defaulted claims unless *both* cause and prejudice is demonstrated.  *See Stepney*, 760 F.2d at 45.   Additionally, I find no basis to conclude that Garner is actually innocent of the charge to which he plead guilty.  In light of the foregoing, I recommend that petitioner's claim alleging his sentence was harsh and excessive be denied and dismissed given that federal review is precluded based on the independent and adequate state law doctrine.

2.      Garner's Claim Is Not Cognizable

In any event, this portion of Garner's petition overlooks the firmly established principle that "[n]o federal constitutional issue is presented where, as here, the sentence is within the range prescribed by state law."

49

*White v. Keane*, 969 F.2d 1381, 1383 (2d Cir.1992) (*citing Underwood v. Kelly*, 692 F. Supp. 146 (E.D.N.Y. 1988), *aff'd mem.*, 875 F.2d 857 (2d Cir. 1989), *cert denied*, 493 U.S. 837, 110 S. Ct. 117 (1989).   Since Garner does not argue that the court's sentence was not authorized by statute, and given that the imposed sentence was within the statutory range having a minimum of three to twelve and one-half years and a maximum of six to twenty-five years, *see* N.Y. Penal Law §§125.20 (defining first-degree manslaughter as a class B felony); 70.02(2)(a), (3)(a) and (4) (defining the sentences for class B felonies), this theory cannot afford him relief.

Garner's challenge to his sentence arguably could be construed as a claim that the sentence imposed resulted in his suffering cruel and unusual punishment in violation of the Eighth Amendment.   That amendment, however, forbids only extreme sentences which are "grossly disproportionate" to the crime of conviction.   *Lockyer v. Andrade*, 538 U.S. 63, 72-73, 123 S. Ct. 1166, 1172-73 (2003); *Harmelin v. Michigan*, 501 U.S. 957, 995, 111 S. Ct. 2680, 2701 (1991).   It is well-established that a sentence of imprisonment that is within the limits of a valid state

statute is not cruel and unusual punishment in the constitutional sense. *See White*, 969 F.2d at 1383; *Lou v. Mantello*, No. 98-CV-5542, 2001 WL 1152817, at *13 (E.D.N.Y. Sept. 25, 2001).  The Supreme Court has held that, for offenses less than manslaughter, sentences longer than twenty-five years are not grossly disproportionate.  *See Staubitz v. Lord*, No. 03-CV-0671, 2006 WL 3490335, at *2 (E.D.N.Y. Dec. 1, 2006) (citing *Ewing v. California*, 538 U.S. 11, 123 S. Ct. 1179 (2003) (twenty-five years to life for grand theft) and *Harmelin*, 501 U.S. at 1104, 111 S. Ct. at 2706 (life in prison without the possibility of parole for cocaine possession)).  Garner's sentence clearly was within the realm contemplated by relevant law.

In sum, since the sentence imposed was plainly within the limits authorized by statute, and was not grossly disproportionate to the crime of conviction, I recommend that this ground of Garner's petition be denied.

F.    Prosecutorial Misconduct

Garner claims in Ground III of his second amended petition that statements provided by two recanting witnesses, Sharonica J. Currie and

Rashida Butler Scott, demonstrate that his guilty plea and conviction were the result of "duress misrepresentation or fraud on the part of the prosecution."  Second Amended Petition (Dkt. No. 32) ¶ 13, Ground 3, Affidavit at A, B.  Specifically, Garner claims that these witnesses were threatened with prosecution if they did not testify falsely against him, and had he known they lied, he would not have pleaded guilty.  *Id.*

Although Garner did not raise this claim on direct appeal, he did raise the allegations in his first CPL 440 motion, and attached the same affidavits from the recanting witnesses that are attached to his current habeas petition.  *See* CPL Motion 1, Exh. 1.   The state court denied relief, finding no evidence that the judgment of conviction was obtained by duress, fraud or misrepresentation by the prosecutor.  *See* September, 2002 Decision.  Garner again raised this claim in his second section 440 motion, and the county court denied the petitioner's assertion "relating to claims of false testimony" reasoning that

> [it was] previously determined by the Court, or the arguments relate to claims that are on the record and the defendant failed to raise them on appeal, or the arguments could, with due diligence have been placed on the record for appellate review. . . . the said arguments [therefore] remain subject to

52

> a mandatory bar pursuant to C.P.L. Section
> 440.10(2)(a) and a permissive procedural bar
> under C.P.L. Section 440.10(3)(b).

July, 2005 Decision at 2.  Complicating the matter, the county court also

concluded its opinion by denying the motion in its entirety pursuant to

CPL § 440.30(4)(a).  *Id.* at 3.

CPL § 440.10(2)(a) is a mandatory state bar that requires a court to

deny a motion to vacate a conviction when the ground raised in the

motion was previously determined on the merits on appeal.  N.Y. Crim.

Proc. Law § 440.10(2)(a).  CPL § 440.10(3)(b) is a permissive state bar

that allows a state court to deny a motion to vacate a conviction where

the ground raised was previously determined on the merits in a prior

motion to vacate.  N.Y. Crim. Proc. Law § 440.10(3)(b).  It is questionable

whether the state court's reliance on these sections constitutes a

procedural bar to federal review.  District courts within the Second Circuit

disagree as to whether a state court's reliance on CPL § 440.10(2)(a) in

denying a constitutional claim results in the procedural default of that

claim on federal habeas review.  *See, e.g., Cruz v. Berbary*, 2006 WL

2946946, at *8 (W.D.N.Y. Oct. 16, 2006) (concluding that CPL §

53

440.10(2)(a) constitutes adequate and independent state ground resulting in procedural default of petitioner's federal *habeas* claims); *Hronopoulos v. Keane*, 1999 WL 529559, at *4 (E.D.N.Y. July 21, 1999) (finding that petitioner's claim was procedurally barred under CPL § 440.10(2)(a)); *Encarnacion v. Walker*, 1998 WL 34002608, at *4-5 (N.D.N.Y. Aug. 21, 1998) (Sharpe, M.J.) (identifying CPL §§ 440.10(2)(a) and (b) as adequate and independent state procedural rules), *adopted*, No. 96-329, Dkt. No. 17 (N.D.N.Y. Aug. 24, 1999) (Scullin, D.J.); *cf. Douglas v. Hollins*, 2004 WL 187130, at * 6 n.5 (S.D.N.Y. Jan. 29, 2004) (finding that state court ruling under CPL § 440.10(2)(a) "does not constitute a finding of procedural default that precludes federal habeas review of the merits"); *Guzman v. Couture*, 2003 WL 165746, at *11 (S.D.N.Y. Jan. 22, 2003) ("A dismissal under § 440.10(2)(a) is not based on any procedural default.  To the contrary, it is premised on a prior decision.") (quotations omitted); *Taylor v. Kuhlmann*, 36 F. Supp. 2d 534, 546 (E.D.N.Y. 1999) (same); *see also Williams v. Duncan*, No. 03-CV-568, 2007 WL 2177075, at *19 (N.D.N.Y. July 27, 2007) (Kahn, D.J. and

Treece, M.J.) (recognizing diverging case law).[9]  While the case law regarding section 440.10(3)(b) is less prolific, a state court's reliance therein also may result in a procedural bar to habeas review.  *See, e.g., Soto v. Portuondo*, No. 02-CV-28, 2004 WL 2501773, at *5 (E.D.N.Y. Nov. 5, 2004) (alluding to section 440.10(3)(b) as a procedural bar).

On the other hand, under CPL § 440.30(4)(a), "[u]pon considering the merits of the motion, the court may deny it without conducting a hearing . . . if [t]he moving papers do not allege any ground constituting legal basis for the motion."  N.Y. Crim. Proc. Law § 440.30(4)(a).  Habeas courts generally consider a state court's reliance on section 440.30(4)(a) to constitute an adjudication on the merits.  *See Ortiz v. Keohane*, No. CV-94-0124, 1995 WL 669904, at *4 n.5 (E.D.N.Y. Nov. 5, 1995) (asserting that section 440.30(4)(a) in fact provides that a trial court may deny a motion to vacate "upon considering the merits");

---

[9]      The Second Circuit has not conclusively determined whether CPL § 440.10(2)(a) is an adequate and independent state ground precluding federal habeas review on the merits.  *See Fernandez v. Artuz*, 402 F.3d 111, 115 n.4 (2d Cir. 2005) (identifying CPL §§ 440.10(2)(a) and 440.10(2)(c) as procedural bars under New York law) (citing *Artuz v. Bennett*, 531 U.S. 4, 8 (2000)); *but see Silverstein v. Henderson*, 706 F.2d 361, 368 (2d Cir. 1983) (stating that a state court ruling under CPL § 440.10(2)(a) "does not constitute a finding of procedural default that would bar federal consideration of [petitioner's] claims").

*Muhammad v. Kirk*, No. 90 Civ. 1667, 1993 WL 37502, at *4 (S.D.N.Y. Feb. 8, 1993) (same).

While Garner's prosecutorial misconduct claim arguably is procedurally defaulted, given the diverging views regarding which standard a federal habeas court should apply when a state court ruling relies on CPL § 440.10(2)(a) and in light of the ambiguity inherent in the state court's holding on petitioner's second section 440 motion, wherein the court seemed to rely on both procedural and substantive grounds to dismiss petitioner's claims based on false witness testimony, I have opted to conduct a *de novo* review of the county court's decision denying this theory of relief.  *See Aparicio*, 269 F.3d at 93; *cf. Soto*, 2004 WL 2501773, at *5 (choosing to decline to "untangle the complicated procedural bar issues" and instead reviewing petitioner's claims on the merits where issues were "easily resolvable").

    1.    <u>Perjured Testimony</u>

\_\_\_\_\_"The Supreme Court analyzes claims for wrongful conviction based on perjured testimony under the Due Process Clause of the Fourteenth Amendment."  *Drake v. Portuondo*, 321 F.3d 338, 344-45 (2d Cir. 2003)

(citing *Napue v. Illinois*, 360 U.S. 264, 269, 79 S.Ct. 1173, 1177 (1959)).

A conviction obtained by the knowing use of perjured testimony must be

set aside if there is any reasonable likelihood that the false testimony

could have affected the judgment of the jury.  *United States v. Agurs*, 427

U.S. 97, 103, 96 S. Ct. 2392, 2397 (1976); *United States v. Gallego*, 191

F.3d 156, 161-62 (2d Cir. 1999) (citation omitted), *cert. denied*, 530 U.S.

1216, 120 S.Ct. 2220 (2000)*, rev'd on other grounds*, *Crawford v.*

*Washington*, 541 U.S. 36, 124 S. Ct. 1354 (2004).  A prosecutor "has a

duty to refrain from eliciting and relying upon testimony known to be

perjurious."  *United States v. Gaggi*, 811 F.2d 47, 59 (2d Cir.1987), *cert.*

*denied*, 482 U.S. 929, 107 S. Ct. 3214 (1987) (citing *Mooney v. Holohan*,

294 U.S. 103, 112, 55 S. Ct. 340, 341-42 (1935) (per curiam)).  Like

other forms of prosecutorial misconduct, the knowing use of perjured

testimony to obtain a conviction violates a defendant's due process right

when the misconduct alleged is so severe and is of sufficient significance

to infect the trial resulting in the denial of the defendant's right to a fair

trial.  *Greer v. Miller*, 483 U.S. 756, 765, 107 S. Ct. 3102, 3108-09

(1987); *Blissett v. Lefevre*, 924 F.2d 434, 440 (2d Cir. 1991), *cert. denied*,

502 U.S. 852, 112 S. Ct. 158 (1991); *Floyd v. Meachum*, 907 F.2d 347, 353 (2d Cir.1990) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 647-48, 94 S. Ct. 1868, 1873-74).

To successfully challenge a conviction based upon the prosecutor's alleged use of perjured testimony, the petitioner has the burden of demonstrating, by a preponderance of evidence, that false testimony was given; in determining whether perjury occurred, a court must "weigh all the evidence of perjury before it." *See Ortega v. Duncan*, 333 F.3d 102, 106-07 (2d Cir. 2003); *see also Agurs*, 427 U.S. at 103, 96 S.Ct. at 2397. The mere showing that perjured testimony was presented does not alone mandate habeas relief. *Ortiz v. Woods*, 463 F. Supp. 2d 380, 393 (W.D.N.Y. 2006); *Vail v. Walker*, No. 96-CV-578, 1999 WL 34818638, at *1 (N.D.N.Y. Aug. 24, 1999). Where the government is unaware of witness perjury at the time of trial, a federal habeas petitioner must establish that the perjured testimony was material, in which case habeas relief is warranted if "the court [is left] with a firm belief that but for the perjured testimony, [he or she] would most likely not have been convicted." *Fama*, 235 F.3d at 816.

In circumstances where a petitioner alleges that a witness has recanted his or her testimony, a petitioner must demonstrate that the recantation was reliable and that the elimination of the perjured testimony would probably result in an acquittal or a retrial. *Ortiz*, 463 F. Supp. 2d at 395. Recantations are inherently unreliable and are viewed with "utmost suspicion." *Sanders v. Sullivan*, 863 F.2d 218, 225 (1988); *Johnson v. Sanbourin*, No. 03 Civ. 0791, 2005 WL 2663039, at *7 (S.D.N.Y. Oct. 14, 2005). A court must be satisfied that the recantation could not have been discovered sooner with the exercise of due diligence. *Ortiz*, 463 F. Supp. at 395.

> 2.   <u>Prosecutorial Misconduct Did Not Result Where Alleged Perjured Testimony Would Not Change the Outcome of Petitioner's Conviction</u>

The evidence in this case, when judged by this standard, establishes that Garner's conviction was not the product of fraud, duress, or misrepresentation on the part of the prosecution. Garner has not established that Scott and Currie committed perjury, much less that the testimony was material and he would not have been convicted but for the alleged falsities.

Garner claims that Currie was pressured to give false testimony against him, although he does not specifically identify the way in which that testimony was false.  A careful review of her statement reveals that according to Currie, she has reconsidered her earlier impression that Garner acted with intent to kill the victim.  In Currie's alleged recantation, she claims that the police interviewed her when she was in shock and in the hospital, and that she simply nodded in agreement with the police version of events that Garner acted intentionally when he shot the victim, further stating that the prosecutor threatened her with a conspiracy prosecution if she refused to testify at the preliminary hearing.  *See* Currie Statement.

Currie made two statements at issue in this petition – one to police, dated February 25, 1998, *see* Second Amended Petition (Dkt. 32) Appendix A-1 ("Police Statement"), and the recantation attached to Garner's second amended petition, dated September 27, 2001 ("Currie Statement").  Currie's accounts of the events that resulted in the shooting recorded in those two statements are virtually identical.  In her statement to police, and in her recantation, Currie stated that she was at Garner's

60

apartment on February 25, 1998 and that as she and a friend were leaving, the victim was coming up the stairs toward the apartment. Police Statement at 1; Currie Statement at 1.  Currie also stated that the victim kicked in the door to the apartment and grabbed her to try to make her leave with him; Garner then pointed a gun at the victim, and the victim told Garner to "do what he got to do." Police Statement at 1; Currie Statement at 3; *see also* Pre-Sentence Statement at 1-2.  In each statement, Currie recounted that the victim had been shot by Garner, and Currie and the victim went into the bathroom, where Currie slammed the door shut and shouted that she was coming out of the bathroom before opening the door again.  Police Statement at 1; Currie Statement at 3. Currie explained in each statement that she walked the victim down the stairs, where a second confrontation with Garner ensued.  Police Statement at 1; Currie Statement at 4.

It is true that Currie's statements differ with regard to exactly how the victim was shot and how many shots were fired, both in the apartment and at the bottom of the stairs of the building.  In her statement to police, Currie stated Garner shot the victim in the stomach

61

while they were in the apartment, and in the recantation, Currie claims

Garner fired the gun in the air and the victim was shot.  Police Statement

at 1-2; Currie Statement at 3-4.  Currie told police that, when they

reached the bottom of the stairs, Garner pointed the gun at her and the

victim, that Garner's cousin pushed her out of the way so Garner had a

shot at the victim, and Garner fired two more times.  Police Statement at

1.  In the recantation, Currie described a struggle taking place during

which the victim rushed Garner, and the gun went off again.  Currie

Statement at 4.   In each account, Currie noted that her arm was cut in

the process.  Police Statement at 2; Currie Statement at 4.

Currie's two statements are fully consistent in noting an ongoing

dispute between Garner and the victim, centering around her.  The chief,

material difference between the two statements is that Currie told police

Garner's actions were intentional, describing how Garner tried to lure the

victim to the apartment, and stated that Garner asked if she would tell on

him if he killed the victim, while in the recantation, Currie portrayed

Garner as her protector who was simply trying to prevent the victim from

assaulting her and that while fulfilling that role, the victim was shot and

62

killed – a version Garner advanced during his guilty plea and at

sentencing.  *See* Police Statement at 1-2; Currie Statement 1-5; Plea Tr.

at 14-17; Sentencing Tr. at 17-32.

I also note that Garner likely was aware of Currie's apparent

change of heart regarding her impression of his intent because she also

expressed that sentiment in a statement she wrote in support of Garner's

pre-sentence memorandum.  Record, Pre-Sentencing Memorandum at

92-95.  Under these circumstances, I view Currie's alleged recantation of

her impression that Garner acted intentionally with extreme skepticism,

and in any event remain unconvinced, particularly in light of the pre-

sentence memorandum statement, that it could not have been

discovered sooner by the petitioner.

In any event, Garner did not plead guilty to intentionally killing the

victim.  Instead, he pleaded guilty to first degree manslaughter, admitting

that he shot the victim with intent to cause serious physical injury.  Plea

Tr. at 17-19.  Garner himself advanced the argument that he was simply

trying to protect Currie and had no intent to kill – an argument surely

considered by the prosecutor when recommending an agreement

63

allowing Garner to plead to first degree manslaughter.  Thus, even if Currie's statement to police contained a false impression regarding Garner's state of mind, that impression did not result in a conviction for murder.  And, given the consistency in the accounts advanced by Currie in her multiple statements, the outcome would not have been altered even absent Currie's initial impressions.

The same is true of Garner's claim regarding the alleged recantation by Scott.  Garner has presented some evidence, in the form of Scott's plea and sentencing minutes, that Scott testified against him in the grand jury and at a pretrial hearing, and that she also gave a statement to police.  Garner does not, however, attach a copy of Scott's original statement to police or any of the testimony given by Scott, making it all but impossible to draw a comparison between the initial statements/testimony and the alleged recantation.  Scott alleges in her recantation that she did not take a gun from Garner and that she did not "see anything that happened with that situation on February 25, 1998." *See* Second Amended Petition (Dkt. No. 32) Appendix C.  It is reasonable to deduce that Scott previously told police, and testified, that

Garner handed her the gun and that she witnessed at least part of the incident.[10]

Upon careful *de novo* review, I find that Scott's recantation does not impact upon the constitutionality of Garner's conviction.  Even if Scott had initially told police that she did not see anything and that Garner did not give her the gun, as asserted in her recanted statement, the outcome resulting in petitioner's conviction would not have changed.  Garner admitted not only to possessing the gun, but to using it to shoot the victim, and Currie's essentially consistent eyewitness account of the events surrounding the shooting supported Garner's allocution.  Garner's claim of prosecutorial misconduct should therefore be denied.

G.    *Brady/Giglio* Claim

In the final ground raised in his petition, Garner claims that the prosecution entered into a cooperation agreement with Scott but failed to disclose it to him or to his counsel.  *See* Second Amended Petition (Dkt. No. 32) Affidavit at 3.  According to the petitioner, Scott now claims she

---

[10]    In Currie's statement to police, she claimed that Garner handed the gun to "one of the black girls from the downstairs apartment," but that he took the gun back and pointed it at her and the victim.  Police Statement at 1.  In her statement, however, Currie does not identify Scott by name.  *Id.*

only agreed to testify against him because she was threatened by the

prosecution that she would be sentenced to twenty-five years to life if she

did not subscribe to the prosecution's false version of the relevant

events.  *Id.*  Garner claims that the prosecutor's failure to disclose the

agreement, and the failure to disclose Scott's alleged perjury, prevented

him from advancing a justification defense.  *Id.* at 4.  Finally, despite

Scott's new assertion that she did not even witness the shooting, Garner

claims that the prosecution acted to discourage Scott from testifying in

his defense.  *Id.* at 7-8.

This claim was raised by Garner in his second section 440 motion,

following the stay of this proceeding in order to permit him to exhaust the

claim in state court.  *See* CPL Motion 2.  In that application, Garner

alleged that the prosecutor entered into a plea agreement with Scott, who

was arrested the same day the victim was shot, after police found her in

possession of cocaine weighing more than half an ounce.  CPL Motion 2,

Exh. J.  Scott was subsequently charged with two counts of criminal

possession of a controlled substance in the third degree, a class B

felony.  *Id.*  According to the minutes of the court proceeding at which

she entered her plea, Scott faced a maximum sentence of eight and one third to twenty-five years in prison if convicted, but was promised no worse than one to three years in prison and a youthful offender adjudication if she continued to cooperate and to tell the truth in an unrelated case.  *Id.* at 2-3.  Although the plea minutes do not specifically reference Garner's case, the prosecutor noted on the record that "the trial of which [Scott's] cooperating has been scheduled by this Court for September 14" – the same day that Garner's trial was scheduled to begin.  *Id.* at 16; *see also* Plea Tr. at 5.

Scott was sentenced on September 30, 1998.  At her sentencing, the prosecutor informed the court that Scott had cooperated in a "homicide case" by "giving a statement, testifying before the grand jury, testifying at a hearing."  CPL Motion 2, Exh. K at 2.  The court adjudicated Scott a youthful offender, and sentenced her to serve one year in the county jail.  *Id.* at 4.

In its decision denying relief under CPL § 440.10, the county court did not specifically address Garner's *Brady/Giglio* claim.  As was previously discussed, the county court reiterated that Garner's claim with

regard to the alleged false testimony of two witnesses "has been previously determined by the Court, or the arguments relate to claims that are on the record and the defendant failed to raise them on appeal, or the arguments could, with due diligence, have been placed on the record for appellate review" and ruled that the claims were procedurally barred under CPL §§ 440.10(2)(a) and 440.10(3)(b).  *See* July, 2005 Decision at 2.

A careful review of Garner's direct appeal and first CPL 440 motion, however, shows that the specific claim that the prosecutor withheld information about a cooperation agreement with Scott in violation of *Brady/Giglio* was not raised in either forum, a fact which prompted this court to allow Garner the option to exhaust the claim in a second CPL 440 motion.  While the state court also denied Garner's second motion to vacate in its entirety based upon CPL § 440.30(4)(a), which permits a state court to deny a motion where, after considering the merits of the claim, the moving papers do not allege a legal ground for the motion, the July, 2005 Decision fails to mention the *Brady/Giglio* claim, and, thus, there is no state court finding that I can say with certainty represents an

adjudication of the *Brady/Giglio* claim on the merits.  Accordingly, in light of the ambiguity inherent in the county court's decision, I will review "*de novo* the state court disposition of the petitioner's federal constitutional claims."  *Aparicio*, 269 F.3d at 93.

A petitioner may be entitled to federal habeas relief if he or she shows that the government violated the right to due process by failing to turn over "material exculpatory evidence" before trial.  *Giglio v. United States*, 405 U.S. 150, 153-54, 92 S. Ct 763 (1972); *Brady v. Maryland*, 373 U.S. 83, 86-87, 83 S. Ct. 1194, 1196 (1963); *see generally Strickler v. Greene*, 527 U.S. 263, 119 S. Ct. 1936 (1999).  Under *Brady* and its progeny, prosecutors must disclose information that is favorable to the defense, either because it is exculpatory (relating to the factual innocence of the defendant) or because it serves to impeach the government's witnesses. *Strickler*, 527 U.S. at 280, 119 S. Ct. at 1948; *United States v. Bagley*, 473 U.S. 667, 676, 105 S. Ct. 3375, 3380 (1985).  Evidence that is favorable because of its impeachment value may be material where the witness supplied the only evidence linking a defendant to the crime at issue, or where the witness supplied the only

69

support for an essential element of the crime.  *United States v. Avellino*,

136 F.3d 249, 256-57 (2d Cir. 1998).  The duty to disclose extends to

plea agreements with cooperating witnesses:

> When the government enters into an agreement
> or understanding with one of its key witnesses
> regarding a pending prosecution . . . the
> prosecutor has two interrelated obligations.  First,
> the prosecutor must disclose the agreement to
> the defense.  Second, the prosecution may not
> knowingly solicit false trial testimony about the
> deal or allow false testimony to go uncorrected if it
> appears.

*Chandras v. McGinnis,* No. 01 Civ. 2519, 2002 WL 31946711, at *4

(E.D.N.Y. Nov. 13, 2002) (citations omitted); *see also Shabazz v. Artuz*,

No. 97 CV 1704, 2002 WL 873319, at *3 (E.D.N.Y. Apr. 29, 2002), *aff'd*,

336 F.3d 154 (2d Cir. 2003); *People v. Sibadan*, 240 A.D.2d 30, 34, 671

N.Y.S.2d 1, 4 (1st Dept. 1998) ("The prosecution's duty to disclose *Brady*

material applies to evidence affecting the credibility of a government

witness, including evidence of any agreement or promises of leniency

given to the witness in exchange for favorable testimony against an

accused.") (citations omitted), *leave denied*, 92 N.Y.2d 861, 677

N.Y.S.2d 91 (1998); *People v. Arthur*, 175 Misc.2d 742, 767-68, 673

70

N.Y.S.2d 486, 506 (N.Y. Sup. Ct. 1997).  A petitioner bears the burden of proving that the prosecution withheld material information.  *Harris v. United States*, 9 F. Supp. 2d 246, 275 (S.D.N.Y. 1998).   "Conclusory allegations that the government 'suppressed' or 'concealed' evidence do not entitle [the petitioner] to relief."  *Id.* (quotations omitted).

Favorable evidence is material, where a defendant enters a guilty plea, if there is a "'reasonable probability that but for the failure to produce such information the defendant would not have entered the plea but would instead have insisted on going to trial.'"  *Avellino,* 136 F.3d at 256 (quoting *Tate v. Wood*, 963 F.2d 20, 24 (2d Cir. 1992)).  Materiality represents a mixed question of fact and law, and a reviewing court's inquiry focuses on "'the likely persuasiveness of the withheld information.'"  *Id.* (quoting *Tate*).

 When considering *Brady/Giglio* claims in the context of a guilty plea, the United States Supreme Court has drawn a distinction between exculpatory evidence tending to establish that a defendant is factually innocent and impeachment evidence.  *See United States v. Ruiz*, 536 U.S. 622, 633, 122 S. Ct. 2450, 2457 (2002); *see also McCann v.*

71

*Mangialardi*, 337 F.3d 782, 787-88 (7th Cir. 2003).  While a prosecutor must disclose information that would establish that a defendant was innocent prior to acceptance of a guilty plea, in order to ensure that those factually innocent of crimes do not nonetheless plead guilty, the "Constitution does not require the Government to disclose material impeachment evidence prior to entering a plea agreement with a criminal defendant." *Ruiz*, 536 U.S. at 631, 633, 122 S. Ct. at 2450, 2457; *see also Phillips v. United States*, No. 02 Civ. 7002, 2003 WL 21878802, at *1 (S.D.N.Y. Aug. 8, 2003) (quoting *Ruiz*); *but see Avellino*, 136 F.3d at 255 (noting that the obligation to disclose *Brady* material is pertinent for trial and for the determination of whether to plead guilty); *Tate* 963 F.2d at 24 (same).  The Supreme Court has explained that impeachment information is "special in relation to the *fairness of a trial*, not in respect to whether a plea is *voluntary*." *Ruiz,* 536 U.S. at 629*,* 122 S. Ct. at 2455 (emphasis in original).

In so ruling, the Supreme Court has noted two central considerations.  The first consideration revolves around the difficulty in determining how useful the impeachment material would be, particularly

in light of a defendant's own knowledge of the case against him.  *Id.* at

630, 122 S. Ct. at 2456.  Second, the Court has observed that the

recognition of a constitutional obligation to provide impeachment material

during plea bargaining could "seriously interfere with the Government's

interest in securing those guilty pleas that are factually justified, desired

by defendants, and help to secure the efficient administration of justice."

*Id.* at 631, 122 S. Ct. at 2456.  Finally, the Court noted that "the

Constitution . . . does not require complete knowledge of the relevant

circumstances, but permits a court to accept a guilty plea, with its

accompanying waiver for various constitutional rights, despite various

forms of misapprehension under which a defendant might labor."  *Id.* at

630.

        In this instance, Garner does not claim that the prosecution had,

but withheld from him, evidence that he was factually innocent of the

crime of conviction.  Garner's claim is based instead upon evidence that

the prosecutor entered into a cooperation agreement with Scott in

exchange for her testimony against Garner.  Significantly, Garner has not

presented any evidence, aside from his bald assertion, that the

prosecutor failed to advise him and defense counsel of the cooperation agreement.  Thus, Garner has not established that this information was suppressed by the prosecutor.  *See Brady*, 373 U.S. at 83, 83 S. Ct. 1194;  *Harris*, 9 F. Supp. 2d at 275.

Moreover, the allegedly-suppressed information is relevant to Scott's credibility, and thus would qualify as impeachment material which must be disclosed prior to *trial*.  Garner retained no constitutional right to the disclosure of the cooperation agreement with Scott prior to pleading guilt since the agreement represents impeachment material and not evidence of his actual innocence.  *See Ruiz*, 536 U.S. at 633, 122 S. Ct. at 2457.  Further, Scott was not the only witness against Garner, and her apparent testimony regarding the disposal of the weapon and whether she saw anything the day of the shooting did not supply the only evidence of the necessary elements of the crime of first degree manslaughter.  *See Avellino*, 136 F.3d at 256-57.  As was previously noted, Currie was an eyewitness to the incident.  Despite her "recantation," Currie's statements support Garner's allocution and ultimate guilty plea.  Whether Scott took the gun from Garner or not,

Garner admitted he used it to shoot the victim, with the intent to cause serious physical injury to the victim, and that gunshot ultimately resulted in the victim's death. *See Mason v. United States*, No. 01-CR-376, 2005 WL 2709283, at *6 (N.D.N.Y. Oct. 20, 2005) ("Given *Ruiz* and *Brady*, [impeachment information regarding a single government witness] has little bearing on whether Petitioner's decision to waive his constitutional right [to a jury trial] was invalid.").  I therefore recommend that the petitioner's *Brady/Giglio* claim be denied as lacking in merit.  ___

IV.   SUMMARY AND RECOMMENDATION

With the assistance of counsel, Garner entered a plea to a reduced charge of first degree manslaughter, acknowledging both the rights being relinquished as a result of the plea and his culpability for the criminal act forming the basis for his conviction.  The state courts' determination that there was no indication in the record that Garner's plea was obtained in violation of the New York or United States Constitutions, viewed through the deferential lens superimposed under the AEDPA, is neither contrary to, nor an unreasonable application of clearly established Supreme Court precedent.  Counsel negotiated a favorable plea agreement, allowing

Garner to escape the threat of a conviction for second degree murder and a much longer prison sentence than that ultimately imposed. Turning to that sentence, since it fell within the ranges authorized by statute, no Eighth Amendment violation is implicated, and there is no support in the record for the claim that the sentencing court abused its discretion.  Upon *de novo* review, it is apparent that Garner has failed to establish that his conviction was the product of fraud, duress or misrepresentation by the prosecutor, and further has failed to demonstrate a violation of his due process rights pursuant to *Brady/Giglio.*  Finally, Garner's claim that the trial court was biased against him, while unexhausted, should be deemed exhausted and procedurally barred.  Having found no constitutional violation associated with Garner's conviction, it is hereby

RECOMMENDED that Garner's petition be DENIED and DISMISSED in its entirety.

Pursuant to 28 U.S.C. §636 (b)(1), the parties have ten (10) days within which to file written objections to this report.  Such objections shall be filed with the Clerk of the Court.  FAILURE TO OBJECT TO THIS

REPORT WITHIN TEN (10) DAYS WILL PRECLUDE APPELLATE

REVIEW.  28 U.S.C. §636(b)(1); Fed. R. Civ. P. 6(a), 6(e), 72; *Roldan v.*

*Racette*, 984 F.2d 85 (2d Cir. 1993).

It is further ORDERED that the Clerk of the Court serve a copy of

this report and recommendation upon the parties electronically.


Dated:     August 29, 2007
           Syracuse, NY



David E. Peebles
U.S. Magistrate Judge

77